**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**UNITY COMMUNICATIONS, INC.**                                    **PLAINTIFF**

**VERSUS**                               **CIVIL ACTION NO. 2:03cv115KS-MTP**

**AT&T MOBILITY, LLC**                                          **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Motion for Partial Summary Judgment **[#s 266 & 268]** filed on behalf of the defendant.  The court, having reviewed the motion, the response, the briefs of counsel, the pleadings and exhibits on file and being otherwise fully advised in the premises finds that the motion is well taken and should be granted as set forth herein.  The court specifically finds as follows:

## FACTUAL BACKGROUND

After enactment of the Telecommunications Act of 1996( "TCA"), Unity founders Glynn Ingram (president and CEO) and Fred McKibben (CFO) recognized an opportunity to offer multiple communication products on one bill to customers.  The TCA required holders of FCC licenses to offer access to their communications networks and facilities at reasonable rates to competing companies.  Unity was one such company which sought to offer wireless and other communication services purchased from

entities such as AT&T Mobility, LLC ("ATTM")[1] to its customers.  As such, Unity was considered a "post-paid reseller."  In other words, companies like Unity would purchase access to communication networks and facilities which it then sold to its customers. Unity would pay for the access privilege after it billed and collected charges from its customers, hence the "post-paid" designation.  ATTM and other license holders also sold access to their services and facilities on a pre-paid basis, i.e., to "pre-paid resellers."

In 1997, Unity signed a Reseller Agreement with Bellsouth Cellular Corporation ("BSCC"), a wholly owned subsidiary of Bell South Corporation, and predecessor in interest to ATTM.  In September 2000, BSCC assigned most of its cellular-related assets and liabilities, including the Unity Reseller Agreement and any liability associated with that agreement to a subsidiary company, BellSouth Mobility Incorporated ("BSM").  In October 2000, BSM and all of its assets and liabilities were contributed to former named defendant Cingular, with BSM becoming BellSouth Mobility, LLC, a part of Cingular.

Unity began as a start-up company in April 1996.  When it was first organized Unity apparently intended to sell three types of paging services.  Two of the three paging services never came to market after Unity changed its business plan to selling, in addition to paging, wireless, long distance, internet access and local telephone service through franchises.  In June 1997, shortly before Unity entered into the first

_____

[1]  Pursuant to a joint motion of the parties, the court entered a text order on August 6, 2008, reflecting that Cingular had changed its name to AT&T Mobility, LLC ("ATTM") and recognizing that ATTM was the only defendant in the case.  All entities that ultimately became ATTM and which dealt with Unity from 1997 forward may be referred to as ATTM for simplicity.

Reseller Agreement with ATTM, it first offered service of any kind directly to its customers.

In October 1997, Glynn Ingram, then Unity's President and CEO, signed the first Reseller Agreement with ATTM on behalf of Unity.  ATTM alleges that the first Agreement covered only the sale of analog service as none of the Agreement's pricing exhibits mention digital service.  Unity contends that the Agreement required ATTM to offer it the same services sold to "similarly situated" resellers or customers, including digital cellular service.  ATTM sold digital service directly to retail customers through its stores for some alleged eighteen months before offering digital pricing to resellers such as Unity.  It is this alleged transgression that underpins Unity's main argument that ATTM breached its agreements with Unity and, ultimately, put Unity out of business.

In the first Reseller Agreement signed by the parties, Unity agreed to obtain certain volumes of active lines and minutes of  usage in order to obtain the discounted pricing that it actually received under the Agreement.   However, ATTM asserts that Unity never met these volumes as to lines or minutes, but ATTM never adjusted the rates to reflect this failure.

In September 1998, Unity acquired a paging company in Arkansas, paying $5.71 million worth of Unity's preferred stock.  In 1999, Unity gave over $69 million in cash, a note payable, and Unity stock to acquire five paging companies and a sixth company that sold cellular and paging service.  The companies had customer bases in Las Vegas and different parts of Texas, Kentucky, California, Alabama and New Mexico.  Unity raised approximately $96 million in equity capital to fund these purchases.  Unity also entered numerous reseller agreements with wireless providers other than ATTM for

these service areas.  Unity's plan was, apparently, to convert these paging customers to the more lucrative product of wireless telephone service.

On February 28, 2003, Unity filed the instant lawsuit against Cingular/ATTM. Unity amended its Complaint on July 8, 2003, asserting violations of the Telecommunications Act of 1996, the Sherman Anti-Trust Act, and common law claims for a pattern of illegal and predatory conduct by Cingular with the intention of destroying Unity's business.  Cingular moved for summary judgment on the affirmative defenses of mutual accord and satisfaction and the releases, which this court denied on October 20, 2004.  The denial was affirmed by the Fifth Circuit on March 23, 2006.

On March 15, 2006, Cingular filed a motion requesting that trial on the merits be bifurcated, or alternatively, to compel arbitration.  Cingular subsequently filed  a motion to dismiss on May 8, 2006.  Unity requested that the court stay its decision on the motion to dismiss pending resolution of bifurcation motion.  On June 27, 2006, the court denied the bifurcation motion.  Cingular filed a notice of appeal of the order as well as a motion to stay the proceedings pending appeal.  The court denied the motion for stay on September 15, 2006.  The Fifth Circuit affirmed the court's ruling on the bifurcation and arbitration issues on December 28, 2007.

After the filing of the May 2006 motion to dismiss, Unity withdrew all claims under the TCA, leaving only common law claims of Breach of Contract (Count IX); Tortious Breach of Contract (Count X); Promissory Estoppel (Count XI); Tortious Interference with Contract (Count XII); Tortious Interference with Business Relations/Prospective Economic Advantage (Count XIII); and Breach of Implied Duty of Good Faith and Fair Dealing (Count XIV).  On September 25, 2006, the court granted the motion to dismiss

as to the promissory estoppel, tortious interference with contract, and tortious interference with business relations or economic advantage claims. The motion was denied with respect to the breach of contract, tortious breach of contract, and breach of implied duty of good faith and fair dealing.

At the conclusion of discovery, ATTM filed the present motion for Partial Summary Judgment as to the plaintiff's claims of breach of contract and tortious breach of contract, but not as to the claim of the breach of the implied duty of good faith and fair dealing. ATTM also moved for partial summary judgment with respect to the damages that Unity seeks under all of its remaining claims asserting a limitation of damages clause in the contracts between the parties. Finally, ATTM also moved for summary judgment on its counter-claim against Unity. The court heard oral argument on the case on June 1, 2009, and the case is ripe for decision.

## **STANDARD OF REVIEW**

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the

evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role.  *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir. 1986).  "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  The dispute must be genuine, and the facts must be material." *Id.*  "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment."  *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987).  Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial.  *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552."  *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).  In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion.  *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The movant accomplishes this by informing the court of the basis of its motion, and by

identifying portions of the record which highlight the absence of genuine factual issues. *Topalian*, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P. *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'" *John*, 757 F.2d at 712 (quoting

-7-

*Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

This court has previously ruled that Georgia law applies to the contract issues in this case based on the choice of law provision found in Section 27 of the Reseller Agreements. *See* Docket Entry No. 136. Under Georgia law, in construing a contract the trial court first must decide whether the contract language is ambiguous, if there is any ambiguity, the trial court then must apply the applicable rules of construction in an effort to resolve the ambiguity, at which point if any ambiguity remains the interpretation is a question of fact for the jury. *Maiz v. Virani*, 253 F.3d 641, 658-59 (11th Cir. 2001) (applying Georgia law). The rules of construction include: interpreting technical words or words used in a particular trade or business as such words are used in that trade or business; a custom of any business or trade that amounts to a "universal practice" implied as part of the contract and any doubt is construed "strongly" against the drafting party. Ga. Code Ann., §13-2-2 (2), (3 ) and (5). The "cardinal rule of construction, "however," is to ascertain the intent of the parties. Ga. Code Ann., §13-2-3.

When attempting to ascertain the intent of parties, the trial court should consider the language of the contract in light of the surrounding circumstances, and if after applying the rules of construction the intent of the parties continues to be disputed and capable of more than one interpretation, then interpretation of the contract is a "factual matter for resolution by the jury and not a matter of law for determination by the court." *Maiz v. Virani*, 253 F.3d at 659.

After applying the applicable rules of construction", extrinsic evidence becomes admissible to explain any remaining ambiguity," and "parol evidence is admissible to explain an ambiguity in a written contract although such evidence is inadmissible to add

to, take from, or vary the writing itself." *Empire Distributors, Inc. v. George L. Smith, II Georgia World Congress Center Authority*, 509 S .E.2d 650, 653 (Ga. App.1998). A jury is entitled to consider "the circumstances surrounding the transactions in order to determine the scope and effect of the agreements between the parties," and parol evidence is admissible to explain ambiguities, "the question as to what was intended being an issue of fact for the jury." *Id.*, 509 S .E.2d at 654.


## ANALYSIS

As stated, Unity's primary complaint in this lawsuit is that ATTM failed to make digital service available for resale until July 1999, approximately 18 months after ATTM made digital service available to its own retail customers in the Jackson, Mississippi market. As a result of this alleged delay, Unity contends that its business was devastated to the point that in 2001 it sold its wireless customer base to ATTM at fire sale prices in exchange for partial forgiveness and forbearance on certain debts owed by Unity to ATTM and its subsidiaries.

ATTM had begun offering digital cellular service as early as October 1997 in some markets to its cellular customers. By January 1998, it was offering the service directly to its own retail customers through its retail stores in the Jackson, Mississippi market. The retail rates charged for digital cellular were cheaper for the ATTM retail customers than the wholesale analog rates being charged to Unity. Once Unity found out about the availability of digital service in the Jackson market, it began pressing ATTM for wholesale digital rates. ATTM contends that it was aware of the rate disparity and was actively working with its resellers to provide digital rates as soon as they could be

established.  ATTM began working on digital rates in February 1999 and had the second

Reseller Agreement, which contained the digital rates, ready in July 1999.  The

Agreement was ultimately executed by Unity in October 1999.

In the meantime, because Unity was having trouble keeping its analog customers

in the face of cheaper digital service, ATTM unilaterally provided a 20% discount on the

analog rates charged to Unity from March 1999 through October 1999.  Nevertheless,

Unity contends that by the time the digital rate structure was provided, it had lost a

significant portion of its customer base.

In addition to the digital rate issue, Unity contends that ATTM was also offering

free long distance and roaming to its retail customers while charging it for these services.

Unity argues that this is a violation of the Reseller Agreements based on its assertion

that ATTM was obligated to provide Unity with the same rates charged to other "similarly

situated" resellers or customers.  ATTM responds that its retail customers are not

"similarly situated" resellers or customers on par with Unity.  Further, ATTM points out

that it had to pay other license holders for actual roaming charges and long distance

charges incurred by its retail customers and by Unity's customers and that it passed the

charges incurred by Unity's customers through to Unity as provided in the Agreement.

ATTM contends that it made a business decision to provide free roaming and long

distance services to its retail cellular customers even though it was still responsible for

paying the other license holders for such charges.  ATTM considered these charges to

be a cost of doing business and a marketing tool in order to keep and secure additional

customers for its lucrative cellular business.

ATTM contends that Unity's demise was due to extreme mismanagement by the

company, not by any action of ATTM.  In fact, ATTM points out that in late 2000, a Special Committee of Unity's Board hired a consulting firm, Allomet Partners, Ltd., ("Allomet") to investigate the acute financial problems Unity was then experiencing and to report to the Special Committee.  Allomet concluded that Unity had a flawed business strategy by diversifying into unproven markets in scattered geographic regions.  Allomet also found that management and financial reporting were not adequate for internal or external purposes.  The management of Unity disagreed with these findings, especially when the Special Committee recommended to the Board that both the CEO and CFO be replaced.

On March 2, 2001, a little over two months after the Special Committee issued its report, ATTM sent Ingram the Letter Agreement, whereby Unity ultimately exited the Reseller Agreement with ATTM.  After ATTM agreed to give Unity certain billing credits and paid Unity almost $300,000 for Unity's customer base, Unity owed ATTM over $400,000.  The Letter Agreement and attached Note provided that Unity would pay the remaining balance in ten equal installments over the remainder of 2001.  As part of its exit from the reseller business with ATTM, Unity also executed a release to Pacific Bell Western ("PBW"), an affiliate of ATTM which provided that Unity would pay PBW $1,000,000 in equal installments by the end of 2001.  Unity has admitted that $325,130.40 under the Letter Agreement with ATTM and $850,000 under the PBW Release remains unpaid.


**Breach of Contract Claims for Free Roaming and Long Distance**

ATTM first argues that it is entitled to summary judgment on Unity's claim that

ATTM breached the Agreements by offering free roaming and long distance to its retail customers but not to Unity. However, Sections l3(c) and 15 of the Reseller Agreements explicitly require Unity to pay long distance and roaming charges. Section 13(c) provides "Customer shall be charged for call durations while roaming outside the Company service area in accordance with charges imposed by the serving company providing the roaming service."

Section 15 provides, in relevant part:

(a)     The Customer is responsible for paying all toll charges resulting from the origination of calls to points outside the Cellular Geographic Service Area from which the call originates and all other charges or calls billed to the Customer's Access Numbers . . ..
. . .

(d)     The Customer shall pay charges for services allowing automatic or manual roaming service at the rate paid by Company plus $.05 per minute. Such charges shall be passed through to Customer . . ..

Further, in the second  Reseller Agreement, Unity specifically acknowledged that it would pay for long distance through a pricing exhibit with long distance rates. There is no requirement in either of the Reseller Agreements which require ATTM to offer free long distance or roaming charges to Unity, and Unity has provided no evidence otherwise. Clearly, Unity was required to pay for these charges under the contract between the parties, which is clearly not ambiguous. Viewing the evidence in the most favorable light to Unity, its claims on this issue fail as it has not pointed to a genuine issue of disputed fact that ATTM breached either of the Reseller Agreements by charging Unity for these costs.


**Breach of Contract Claims for Disparate Service**

ATTM next asserts that it is entitled to summary judgment on Unity's claim that ATTM breached Section 2(a) of the Reseller Agreements by selling service to its own retail stores at better rates than those given to Unity, including digital service. To support this claim, Unity asserts that ATTM sold cellular service to a separate retail subsidiary, which in turn resold to customers, thus, Unity was not treated equally with "similarly situated" resellers or customers.

The relevant portion of Section 2(a) of both Reseller Agreements provides:

> The Company and the Licensees shall extend to Customer the same cellular service rates and terms, including volume discounts, offered by them to any other resellers or other similarly situated customers (similarly situated shall be based on the number of subscriptions, length of contract, minimum purchase commitments, and number of Licenses from which Service is purchased) of the Licensee's service whether affiliated or not.

There is absolutely no factual support for Unity's claim in this regard. There is no evidence that the ATTM's retail stores were "resellers." ATTM's witnesses have testified that no such reseller relationship existed between ATTM and its retail stores. ATTM simply sold its products and services directly to retail customers through its stores. Unity's witnesses who testified as to what they "thought" or what they "believed" about the retail stores' affiliation with ATTM is nothing more than rank speculation without a basis in the facts.

Nor were ATTM's retail stores "customers" within the meaning of Section 2(a), contrary to Unity's claims. Unity purchased service from ATTM and then repackaged, re-branded. repriced, and resold service to Unity's customers, while the ATTM retail stores did not "purchase" cellular service from ATTM, they simply sold ATTM service directly to customers. A plain reading of Section 2(a) makes it clear that ATTM was only required

to offer Unity the same rates (taking into account volume discounts) as ATTM offered other resellers and similarly situated customers, which ATTM's retail customers were not. The contract is crystal clear on this issue and Unity's attempt to create an ambiguity therein fails.

**Tortious Breach of Contract Claims**

Next, ATTM contends that because Unity has failed to offer any evidence that ATTM acted maliciously or with gross or reckless disregard for Unity's rights, it is entitled to summary judgment on Unity's claim for tortious breach of contract. Tortious breach of contract requires, in addition to the breach, some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort. *Wilson v. Gen. Motors Accep. Corp,* 883 So.2d 56 (Miss. 2004); *Robinson v..Southern Farm Bur. Cas. Co.*, 915 So.2d 516, 520( Miss. Ct. App. 2005). Where there has been no breach of contract, the plaintiff cannot recover for tortious breach. *See Braidfoot v. William Carey College*, 793 So.2d 642 (Miss. Ct. App. 2000). To recover for tortious breach, a plaintiff must show that it is entitled to punitive damages, as the general rule for recovery under a tortious breach claim is the same as the general rule for recovery of punitive damages in a breach of contract action. "Although punitive damages are not ordinarily recoverable in cases involving breach of contract, they are recoverable where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort." *Paracelsus Health Care Corp. v. Willard*, 754 So.2d, 437, 447 (Miss. 1999)( citations omitted).

Punitive damages are to be assessed only in extreme cases. See *Gardner v.*

*Jones*, 464 So. 2d 1144, 1148 (Miss. 1985). "Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed with caution and within narrow limits."  *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So.2d 620, 622 (Miss.1988).  When deciding whether to submit the issue of punitive damages to a trier of fact, the court is required to examine the totality of the circumstances as established by the record, to determine if a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard in order to justify the imposition of punitive damages. See *Ross-King-Walker, Inc. v. Henson*, 672 So.2d 1188, 1191 (Miss.1996).

Unity can point to no real evidence that ATTM acted with malice or with gross or reckless disregard for Unity's rights.  Unity's principles, Ingam, McKibben and Phillips, all testified that they knew of no evidence of intent by ATTM to harm Unity.  Counsel's argument to the contrary is simply without merit.  There is simply no evidence in the record which creates a genuine dispute that ATTM acted with malice, gross negligence or reckless disregard toward Unity.  The tortious breach claim thus fails.


**Limitation of Damages Provision**

In its final argument for summary judgment on plaintiff's claims, ATTM contends that the limitation of damages clause contained in Section 5 of both Reseller Agreements prohibits any damages over and above standard contract damages, i.e., benefit of the bargain damages.  The first damages limitation provision is contained in Section 5 of the Reseller Agreements and provides:

> (h)     EXCEPT AS OTHERWISE PROVIDED HEREIN, IN NO EVENT WILL EITHER PARTY AND/OR ANY OF ITS AFFILIATES BE LIABLE TO OR THROUGH THE OTHER PARTY FOR ANY OF THE FOLLOWING:

. . .

(3)     Except as otherwise set forth herein,any lost profits, loss of business, loss of use or interruptions of business, lost savings opportunities, special, incidental, indirect, exemplary or punitive damages;

any or all of which arise from or in connection with the delivery, use, or performance of service governed by this Agreement, and even if a party and/or any of his affiliates has been advised of the possibility of such loss.

Reseller Agreement, Section 5(h)(3).  A second damages limitation provision is contained in Section 31:

31.     Lost Profits.  Except as otherwise provided herein, Company and Customer mutually agree that each shall have no liability to the other for any indirect, incidental, special or consequential damages (including lost profits) or punitive damages arising out of or related to this Agreement of the performance or breach hereof, even if advised of the possibility of such damages.

Reseller Agreement, Section 31.

The Fifth Circuit has held that the law of the state designated in a choice of law provision governs a determination of the enforceability of a separate damages limitation provision in the same contract.  *See Overstreet v. Contigroup Companies, Inc.*, 462 F.3d 409, 410-12 (5th Cir. 2006).  Thus, the Choice of Law Provision contained in Section 27 of the Reseller Agreements governs the rights of the parties under the contracts.  Therefore, Georgia law applies to the determination of the enforceability of the Damages Limitation Provisions contained in the Reseller Agreements.

The defendant contends that the damages limitation provisions are enforceable under Georgia law with respect to both Unity's breach of contract and tort claims.  Unity argues that the provisions only apply to the breach of contract claims.  However, the court has dismissed the specific breach of contract and tortious breach of contract claims as

set forth above and any argument or supposition as to the applicability that the damages limitation provision is relevant to any further determination required by the court is pointless, except to the extent the provision applies to the remaining claim of breach of the implied duty of good faith and fair dealing.

In that vein, Unity argues that the breach of good faith and fair dealing claim is a tort. Unity also contends that the court has previously held, through Judge Duval, that this claim is a tort and that the tort claims in this case are governed by Mississippi law. ATTM argues in response, first, that whether the breach of good faith claim is a tort or contract claim is irrelevant as the damages limitation provisions still govern under Georgia law. Secondly, ATTM urges the court to reverse Judge Duval's conclusion that the breach of good faith claim is in fact a tort.

However, a careful reading of Judge Duval's opinion indicates that he made no finding that the breach of good faith and fair dealing claim is a tort. It was treated as, and assumed by the parties, that it was and appears simply not to have been an issue that was resolved by Judge Duval. Indeed, Judge Duval cited *Ferrara v. Walter*, 919 So.2d 876 (Miss. 2005) in discussing the breach of good faith and fair dealing claim asserted by Unity. *Ferrara* relied on *Cenac v. Murry*, 609 So.2d 1257 (Miss. 1992), which is the leading case in Mississippi on the treatment of a claim for breach of good faith and fair dealing in a contractual setting. *Cenac* will be discussed in detail below.

If the court holds that this claim is contractual in nature, the damages limitation provisions of the Reseller Agreements, Sections 5(h) and 31 of the Agreements, clearly and unambiguously limit the types of damages available to Unity. "[I]n Georgia there is no generally applicable rule of law forbidding one contracting party from waiving all

recourse in the event of breach by the other." *Orkin Exterm. Co. v. Stevens* 203 S.E.2d 587, 593 (Ga. Ct. App. 1973). "[U]nder Georgia law, parties are free to contractually limit their available remedies and such limitations are valid and binding." *Overstreet*, 462 F.3d at 4l2, n.2. "Absent a limiting statute or controlling public policy, parties may contract with one another on whatever terms they wish, and the written contact defines the full extent of their rights and duties." *Orkin*, 203 S.E.2d at 592-93.

Under Georgia law, the parties to a contract may exclude the recovery of lost profits and other consequential damages. "To the extent that consequential damages are recoverable in breach of contract actions . . . a clause excluding such damages is valid and binding unless prohibited by statute or public policy." *Mark Singleton Buick, Inc. v. Taylor*, 39l S.E.2d 435, 437 (Ga. Ct. App.1990). Clauses excluding the recovery of lost profits and other consequential damages are not contrary to public policy. *See id.* at 437-38 (Provision excluding recovery of lost profits or other consequential damages not contrary to public policy); accord, *American Car Rentals, Inc. v. Walden Leasing, Inc.*, 469 S.E.2d 431, 433 (Ga. Ct. App. 1996); *see also Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 126-27 (Ga. Ct. App.1 997) (upholding provision prohibiting recovery of lost profits). No Georgia statute has been provided to the court which limits the ability of ATTM and Unity to exclude, by mutual agreement, recovery of lost profits and other consequential damages.

ATTM argues that damages limitations clauses are enforceable in Georgia whether they apply to contract or tort claims. ATTM relies on *Overstreet* to support this contention. *Overstreet* dealt with whether an arbitration clause in a contract governed by Georgia law was unconscionable in a Mississippi case alleging torts. The Fifth Circuit

determined that it was not. However, the Fifth Circuit made clear that it was not ruling on the unconscionability of the entire contract, only as to the arbitration clause. *Overstreet,* 462 F.3d at 411, n.1. Thus, that court did not hold that damages limitation clauses can limit damages in a tort context, especially where the court has concluded that Mississippi law applies to all tort claims in the case.

Nevertheless, under the factual situation presented here, the court is convinced that the breach of the implied duty of good faith and fair dealing in this contract case is not a tort under Mississippi law, thus there is no reason to impose Mississippi tort law on this action. The court reaches this conclusion after a careful reading of *Cenac* and several other cases which deal with this claim as a tort. The distinguishing factor is that *Cenac* deals with a breach of the covenant of good faith and fair dealing as a breach of a promise arising out of duties imposed between parties to a contract, i.e., *ex contractu.* Most Mississippi cases dealing with a breach of the implied duty of good faith and fair dealing arise out of situations where there is no breach of the contract itself, but instead a breach outside the contract but arising as a result of the contract or growing out of the contract, i.e., *ex delicto.* The former is a contract claim and the latter is a tort. The most pertinent example of the latter is where an insurance agent or adjuster is charged with a tort in relation to a denied insurance claim. He cannot be charged with a breach of the contract because he is not a party to it. He can only be charged with an independent tort which arises from his own transgressions, thus *ex delicto.*

In the seminal Mississippi case of *Cenac v. Murry*, *supra*, the Mississippi Supreme Court discussed at length a breach of the duty of good faith and fair dealing between parties to a contract:

All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement. *Morris v. Macione*, 546 So.2d 969, 971 (Miss.1989); *UHS-Qualicare v. Gulf Coast Community Hospital*, 525 So.2d 746, 757 n. 8 (Miss.1987); *Blue Cross & Blue Shield of Mississippi, Inc. v. Maas*, 516 So.2d 495, 498 (Miss.1987); *Perry v. Sears, Roebuck & Co.*, 508 So.2d 1086, 1089 (Miss.1987); Restatement (Second) of Contracts § 205, 99 (1979). The covenant of good faith and fair dealing in contract has force in the statutory law as well. "Every contract or duty within this code imposes an obligation of good faith in its performance or enforcement." Miss. Code Ann. § 75-1-203 (1972). A leading contracts treatise describes the duty of good faith and fair dealing as follows:

> In recent years, courts have often supplied a term requiring both parties to a contract to exercise what is called 'good faith' or sometimes 'good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

Farnsworth, Contracts, § 7.17, 526-27 (1982).

*Cenac v. Murry* 609 So.2d at 1272.

The Mississippi Court went on to analyze the type damages available in *Cenac*

and concluded:

> Our research reveals that in Mississippi, as well as in other jurisdictions, the appropriate remedy for the breach of the covenant of good faith is the measure of expectancy type damages. Each party to a contract has a justified expectation that the other will act in a reasonable manner, and when one party acts outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached. *Story v. City of Bozeman*, 242 Mont. 436, 449, 791 P.2d 767, 775 (1990). In an "ordinary" contract situation, a breach of the covenant is a breach of the contract itself, and contract damages are due. *Story*, 242 Mont. at 449, 791 P.2d at 775.

> We think that damages are the appropriate remedy in the instant case. In prior Mississippi cases which address the breach of the covenant of good

> faith, the appropriate remedy has been one of damages. *Planhouse, Inc. v.*
> *Breland & Farmer Designers*, 412 So.2d 1164, 1166 (Miss.1982);
> *Southwest Gas Producing Co., Inc. v. Seale*, 191 So.2d 115, 122
> (Miss.1966); *Van Zandt v. Van Zandt*, 227 Miss. 528, 538, 86 So.2d 466,
> 470 (1956).

*Cenac*, 609 So.2d at 1273-74.

Based on the foregoing, the court concludes that the claim of Unity for breach of the duty of good faith and fair dealing would be treated as a contract claim under Mississippi law. That being said, there is no reason to impose Mississippi tort law under a choice of law analysis. As such, Georgia law governs this claim and it is subject to the damages limitation provisions of the Reseller Agreements as set forth above.

## **ATTM'S COUNTER CLAIM**

ATTM has provided proof that there is an outstanding balance of $325,130.40 on the March 2001 Letter Agreement and Note and $850,000.00 on the PBW release which ATTM has asserted that Unity has admitted it owes. Unity responds by parsing words and insisting that it has not "admitted" that it owes these sums, and that it is entitled to an offset, presumably from the damages it claims from the alleged breaches by ATTM.

Unity agreed, in discovery, that the outstanding balances are correct and that no further payments have been made. ATTM is entitled to a judgment of $325,130.40 in principal under the March 2001 Letter Agreement and Note and $850,00.00 in principal under the PBW Release.

ATTM has also moved for prejudgment interest on the March 2001 Letter Agreement and Note of 7% under Georgia law and for 10% under California law on the PBW Release. The court will not allow pre-judgment interest at this point as Unity has not

had an opportunity to contest same. If Unity opposes the rate of pre-judgment interest sought by ATTM, it shall file such opposition within ten (10) days of this Order, otherwise, ATTM is instructed to furnish a final judgment on its counter claim with principal and interest calculated at the rates set forth for entry by the court.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Partial Summary Judgment **[#s 266 & 268]** filed on behalf of the defendant is granted and the plaintiff's claims of breach of contract (Count IX) and tortious breach of contract (Count X) are dismissed with prejudice and that the damages limitation provisions of the Reseller Agreements are enforceable under Georgia law and apply to the plaintiff's remaining claim for breach of the duty of good faith and fair dealing.

IT IS FURTHER ORDERED AND ADJUDGED that defendant's motion for summary judgment on its counter claim is granted and it is awarded a judgment against Unity for $325,130.40 in principal under the March 2001 Letter Agreement and Note and $850,00.00 in principal under the PBW Release.

IT IS FURTHER ORDERED AND ADJUDGED that if Unity opposes the rate of pre-judgment interest sought by ATTM, it shall file such opposition within ten (10) days of this Order, otherwise, ATTM is instructed to furnish a final judgment on its counter claim with principal and interest calculated at the rates set forth for entry by the court. A separate judgment shall be entered by the court upon resolution of the prejudgment interest issue in accordance with Rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 17th day of July, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE